UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| IRMA V.,[1] | Case No.  20-cv-04854-RMI |
| Plaintiff, | |
| v. | **AMENDED ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| KILOLO KIJAKAZI, | |
| Defendant. | Re: Dkt. Nos. 15, 23 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for supplemental security income under Title XVI of the Social Security Act. *See* AR at 15.[2] Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council (*see id*. at 1-6), thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both Parties have consented to the jurisdiction of a magistrate judge (dkts. 6 & 9), and both parties have moved for summary judgment (dkts. 15 & 23). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("*AR*"), which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #11. *See* (dkts. 11-1 through 11-13).

United States District Court
Northern District of California

aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs*., 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On October 30, 2017, Plaintiff filed an application for Title XVI benefits, alleging an onset date of March 12, 2015. *See* AR at 15. As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on December 31, 2019. *Id*. at 15-30. The Appeals Council denied Plaintiff's request for review on June 5, 2020. *See id*. at 1-6. Thereafter, Plaintiff sought review in this court on July 20, 2020 (*see* Compl. (dkt. 1) at 1-2) and the instant case was initiated.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff's life has been punctuated with a great many tragic events. By way of background, Plaintiff (who is now 47 years old) was born in Guadalajara, Mexico, and – along with her family – she immigrated to the United States when she was very young. *See* AR at 502. While her early childhood was unremarkable (so far as the record reflects), Plaintiff began to experience serious academic problems during high school, which eventually caused her to drop out and secure work as a part-time childcare provider. *Id*. At around the age of 18, Plaintiff became a marijuana user, a habit which soon led her to start using crack cocaine. *Id*. After giving birth to her first two children, Plaintiff was unable to discontinue her cocaine use, which eventually resulted in both

children being removed from her custody and placed in foster care. *Id*. Tragedy struck when Plaintiff's second child – a two-year-old boy – died in foster care while he was unsupervised in a playground sandbox, suffocating as a result of ingesting too much sand. *Id*. This tragedy caused Plaintiff to seek help in achieving and maintaining sobriety; at which point, she developed a seizure disorder for which she has been medicated, although she continues to experience seizures to this day. *Id*.

Tragedy struck again in 2015 or 2016 when Plaintiff became the unintended victim of a drive-by shooting while standing outside of a grocery store – she was shot in the back three times by errant bullets. *Id*. As a result of those wounds, Plaintiff continues to suffer from severe back pain, numbness in the leg, and spinal damage. *Id*. at 502, 578 (Plaintiff spent 1 week in the hospital, mostly in intensive care), 759 (the shooting left Plaintiff afflicted with migraines and pain in her back and legs), 833 (bullet fragments are still lodged at various locations in Plaintiff's chest). The shooting, and its consequential spinal damage, caused Plaintiff to also suffer thereafter from migraines – a condition with which she was consistently and repeatedly diagnosed. *See id*. at 908, 912, 915, 918, 960, 988, 1037.

Plaintiff successfully discontinued cocaine use in her early thirties, and she discontinued alcohol use in about 2013. *Id*. at 503. In 2017, tragedy struck again when Plaintiff's 7-year-old grandchild died. *See id*. at 582. Plaintiff now suffers from depression, anxiety, posttraumatic stress disorder ("PTSD"), a seizure disorder, intellectual disorder, diabetes mellitus, and obesity. *See id*. at 17, 501. Plaintiff's intellectual disability caused her to never be able to develop literacy skills (*see id*. at 586-87) which, in combination with her other conditions, operated to keep her from being able to work since she was 21 years old (*see id*. at 583). During her early adulthood, Plaintiff went on to have two more children which she managed to support with the help of various public assistance programs. *Id*. at 507.

### *Medical Evidence*

Plaintiff's treatment history and medical records are sparse and disjointed because her financial situation has rendered her unable to secure frequent and thorough medical care – instead, the vast majority of her medical records are either hospital records (ranging from her

United States District Court
Northern District of California

1  hospitalization following the drive-by shooting, or emergency room visits on other occasions) or

2  the records come from various organizations dedicated to providing clinical services to the poor

3  (e.g., La Clinica de la Raza, Street Level Health Project, Bonita House / Casa Ubuntu). On many

4  occasions, Plaintiff's various treatment providers have noted the symptoms of her major

5  depressive disorder (e.g., persistent mood swings, frequently alternating between lability and

6  tearfulness, depressed mood for most of every day, significant weight loss without dieting,

7  persistent fatigue and low-energy, persistent feelings of worthlessness, an inability to think clearly,

8  and a persistent inability to concentrate on completing tasks). *See id.* at 579, 584, 598, 607, 610,

9  960, 965, 981-82.

10  During her course of treatment – over many years – Plaintiff's treatment providers have

11  noted the interconnected and intertwined nature of her impairments; for example, her clinicians

12  have noted that that her seizure disorder fuels her anxiety disorder (in that Plaintiff cannot stop

13  ruminating and worrying about her next seizure event); furthermore, her physical impairments, her

14  PTSD, and her financial condition combine to exacerbate her depression. *See e.g. id.* at 580, 585,

15  981 ("Her depression is also exacerbated by her chronic pain and her posttraumatic symptoms and

16  grief"). Similarly, Plaintiff's medical records contain voluminous support for her anxiety disorder,

17  which is attended with panic attacks, chest tightness, fatigue, heart palpitations, insomnia, and

18  agoraphobia. *See id.* at 908-09, 917, 919, 960-61, 973, 981-82.

19  As for Plaintiff's seizure disorder, during an office visit in June of 2019, Plaintiff's treating

20  neurologist, Antonio Jose Silva Sayago, M.D., personally observed one of Plaintiff's seizures in

21  the clinical setting. *See id.* at 1037-41. Dr. Sayago noted the following observation:

22  During this visit[,] at some point[,] she suddenly turned the head to

23  the right and stopped responding to any external stimuli. She
     displayed [] what seemed to be lip smacking. After two minutes[,] she

24  was again making eye contact and fixating with her gaze in response
     to my voice. She seemed confused and unaware of the event.

25  *Id.* at 1039.

26  Dr. Sayago diagnosed her as suffering from migraines and from partial symptomatic epilepsy with

27  complex partial seizures. *Id.* at 1040. In line with the overarching theme of Plaintiff's conditions

28  exacerbating one another, Dr. Sayago noted that her intellectual disorder worsens her epilepsy as

United States District Court
Northern District of California

1   follows: "it is very difficult to obtain a reliable history as she seems to have poor abstraction and

2   limited insight . . . [which] could be congenital (development delay) . . . I suspect she is not

3   compliant with her antiepileptic drug. A reminder was set on her phone to help her improve

4   compliance with the medication." *Id.*

5   Plaintiff's black-out seizures (of which she does not retain an awareness) were also

6   observed by her clinicians at Casa Ubuntu in November of 2019. *See id.* at 382. On that occasion,

7   while Plaintiff was waiting for her attorneys to pick her up in order to attend the hearing before the

8   ALJ in this case, her clinician noted:

10   I saw [Plaintiff] have a seizure on November 20th, 2019, about a half
11   hour before she was picked up to go attend her Social Security
     hearing. As a result of the seizure, her coffee spilled on her things.
     She was completely unaware that she had a seizure . . . [W]hen an
12   episode happens, it takes her approximately 15 minutes to 'come out
     of it' and be able to resume speaking and moving. However, once she
13   is able to speak and move, she is still often in a confused state, and
     totally unaware that she had a seizure.
14   *Id.*

15   Then, less than one hour later, while Plaintiff and her attorneys were awaiting the commencement

16   of the hearing before the ALJ at the SSA's Hearing Operations facility in Oakland, California,

17   Plaintiff had another seizure which her attorney described in the following terms:

19   While we were waiting to get called into the hearing room, [Plaintiff]
     suddenly became non-responsive, her head fell to the side, and she
20   soon began groaning. I understood that she was having a seizure. I
     briefly stepped outside to seek assistance . . . and [then] [I] tried to
21   engage with [Plaintiff] a few times. She continued to be unresponsive
     for approximately three minutes. She then began to sit up, and become
22   more alert. [Plaintiff] suddenly stood up, smiled, and walked out of
     the waiting room without saying a word. After she was gone for a few
     minutes, [co-counsel] went out to locate her, and could not find her. I
23   then offered to go downstairs to try to find her. As I was approaching
     the elevator, the elevator doors opened, and [Plaintiff] stepped out.
24   We walked back to the waiting room, and were almost immediately
     called into the hearing room [and] [t]he hearing began promptly
25   thereafter.
     *Id.* at 380.
26

27   Moments later, the hearing before the ALJ (which is described *infra*) was commenced.

28   //

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_Medical Opinion Evidence from Treating Sources_

On October 3, 2019, one of Plaintiff's treatment providers at La Clinica de la Raza (Sheila Dominic FNP) completed and submitted a medical source statement regarding Plaintiff's physical impairments. _See id_. at 1050-57. Nurse Dominic began by noting that she had been treating Plaintiff monthly for the better part of a year. _Id_. Plaintiff's diagnoses were (on this form) limited to her epilepsy and her migraine disorder, and Nurse Dominic noted that Plaintiff demonstrates "impaired insight on mental status exams" such that she is "not able to answer simple questions about [her] health." _Id_. at 1051. Nurse Dominic then noted the following about Plaintiff's physical impairments and their limitations: the impairments are expected to last longer than twelve months; Plaintiff cannot sit for longer than 1 hour before needing to change position (_id_. at 1052); Plaintiff's physical impairments will combine to render her off-task more than 30% of the time even when faced with simple work tasks (_id_. at 1056); Plaintiff's impairments are likely to produce good and bad days (_id_. at 1057); and, Plaintiff should be expected to be absent from work for more than four days per month (_id_.). Nurse Dominic then added that "[a]bove all, I feel that [her] psychological / cognitive impairments will affect [her] ability for regular work [as] [Plaintiff] exhibits poor insight, abstraction, [and] concentration." _Id_.

The following day, on October 4, 2019, one of Plaintiff's treatment providers at Bonita House (Chelsea Landolin PNP) completed and submitted a mental impairment questionnaire on Plaintiff's behalf. _See id_. at 1059-63. In completing this questionnaire, Nurse Landolin focused on Plaintiff's major depressive disorder and its attendant symptoms and limitations – identifying the following signs and symptoms: significant deficits in complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition functioning; decreased energy, difficulty concentrating or thinking, depressed mood, and significant difficulties learning and using academic skills. _Id_. at 1061. Nurse Landolin then opined that Plaintiff's major depressive disorder should be expected to cause her to be off-task about 20% of the time, while causing her to be absent from work 2 days per month. _See id_. at 1062. Lastly, Nurse Landolin noted that Plaintiff "is suspected to suffer from a learning disability that would have originated in childhood or adolescence [as] she is not fully literate, she is trying to address this by taking

[reading] classes, but requires extensive additional support and time." *Id*. at 1063

<u>*Consultative Examinations*</u>

On November 5, 2018, Plaintiff was referred for a consultative examination by Eugene McMillan, M.D., a specialist in internal medicine. *See id*. at 692-96. Dr. McMillan's examination focused on some of Plaintiff's physical impairments (to wit, her seizures, her migraine headaches, and her gunshot wounds). *Id*. at 692. To this end, it appears that Dr. McMillan reviewed data from Plaintiff's bloodwork from June 8, 2017, and performed a physical examination. *Id*. at 694. He then noted his diagnostic impressions of Plaintiff's conditions as including seizure disorder and mixed tension and migraine headaches. *Id*. at 695. In the end, he opined that Plaintiff could: occasionally lift and carry 50 pounds; and that she could frequently lift and carry 25 pounds; that she could stand, sit, and walk without limitation; that she could engage in stooping, kneeling, and crouching for at least one third of a workday; that she should avoid working at heights; that she could reach in all directions without limitation; that she experiences no limitations with gross or fine manipulation; and, that she requires no environmental limitations for temperatures, chemicals, or dust. *Id*.

Several months earlier, on August 10, 2018, Plaintiff was referred to Laura Catlin, Psy.D., for a psychological consultative examination. *Id*. at 501-21. Dr. Catlin produced a thorough 20-page report that was based on a clinical interview, records review, and a mental status examination, in addition to administering the following diagnostic instruments: the Wechsler Adult Intelligence Scale ("WAIS-IV"); the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"); the Beck Depression Inventory ("BDI"); and, the Burns PTSD Inventory. *Id*. at 501. On this foundation, Dr. Catlin rendered a number of findings. *See id*. at 501-09. Dr. Catlin found that Plaintiff's conditions combine to render many activities of daily living difficult – for example, she found that Plaintiff's depression causes her to experience difficulty dealing with people she does not know, along with difficulty maintaining her friendships. *Id*. at 502. She also found that Plaintiff's anxiety causes her to no longer participate in pleasurable activities, opting instead to spend her time alone. *Id*. Additionally, Plaintiff's cognitive impairment causes her to experience "severe difficulty concentrating and remembering to do

United States District Court
Northern District of California

1  important things without reminders . . . [such as maintaining] hygiene and basic self-care

2  activities." *Id*.

3          As a result of a mental status examination, Dr. Catlin observed that Plaintiff's mood

4  appeared depressed and anxious; that her affect was labile and congruent with her mood; that

5  Plaintiff reported suicidal thoughts, but had no plans or intent in that direction; and, that Plaintiff's

6  insight and judgment were limited. *Id*. 503-04. She also noted that Plaintiff sleeps a lot more than

7  usual; that she does not have enough energy to do very much; that her concentration was very

8  poor; that her immediate and delayed memory are impaired; and that Plaintiff has experienced

9  appetite disturbances (in that her appetite was greater than usual). *See id*. at 504.

10         Next Dr. Catlin administered the RBANS diagnostic instrument. *Id*. at 504-05. The

11  RBANS is a brief neurocognitive battery which measures immediate and delayed memory,

12  attention, language, and visuospatial skills. *See id*. at 504. The reason for administering this test

13  was "for the detection and tracking of neurocognitive deficits." *Id*. Without delving too deeply into

14  the minutiae of the RBANS results – the court will note the following: (1) Plaintiff's performance

15  in the Immediate Memory Index reflects that she functions in the extremely low range; (2) her

16  performance in the Delayed Memory Index was in the severely impaired range; (3) her

17  performance in the Visuospatial / Constructional Index was in the extremely low range; (4) her

18  performance in the two tasks that make up the language index (Semantic Fluency and Picture

19  Naming) was also situated in the extremely impaired range; and, lastly, (5) Plaintiff's attention

20  span was also measured to occupy the severely impaired range. *Id*. 504-05. Plaintiff's overall

21  score on the administering of the RBANS was in the extremely low range. *Id*. at 504.

22         The administering of the BDI indicated that Plaintiff suffers from symptoms congruent

23  with moderate depression. *Id*. at 505. In this domain, Dr. Catlin found that the signs and symptoms

24  of Plaintiff's depression include: feeling sad most of the time, feelings of guilt and pessimism, and

25  an overall lack of pleasure in life. *Id*. She also found that Plaintiff is saddled with feelings of

26  disappointment in herself and that she blames herself for everything bad in her life – consequently,

27  Plaintiff cries more than she used to. *Id*. Additionally, Plaintiff has difficulty making decisions,

28  and has lost interest in doing much of anything. *Id*. at 505-06. Plaintiff also experiences a

1    persistent low-energy state and sleeps through most of the day and yet still feels fatigued during

2    her remaining waking hours. *Id*. at 506. Lastly, Plaintiff confirmed that she has had, and continues

3    to have suicidal ideations "but would not carry them out." *Id*.

4        As to her history of trauma, the administering of the Burns PTSD Inventory indicated that

5    Plaintiff is still experiencing many symptoms of PTSD. *Id*. During and after these experiences,

6    Plaintiff is generally left feeling intensely afraid, helpless, and horrified; she has been plagued

7    with persistent memories of the event (namely, being shot in the back several times outside a

8    grocery store), and she becomes very upset when thinking about that event. *Id*. Further, Plaintiff

9    avoids people and places that remind her of that event. *Id*. More generally, Plaintiff often feels

10   isolated and alienated from other people, she has trouble sleeping, she has angry outbursts

11   sometimes, she experiences difficulty with concentration, she is easily startled, and she has

12   become hyper-vigilant of her surroundings. *Id*. In all, as Dr. Catlin found – "[t]hese reactions to

13   the event significantly interfere with her life." *Id*.

14       As for the WAIS-IV – Dr. Catlin measured Plaintiff's full-scale IQ ("FSIQ") score at 57,

15   placing her in the bottom 0.2% of individuals her age; or, put another way, Plaintiff's "general

16   cognitive ability is within the extremely low range of intellectual functioning." *Id*. at 514. As for

17   the subcomponents of Plaintiff's FSIQ, those results are as follows: (1) Plaintiff's verbal

18   comprehension score was measured at 61, which in the extreme low range, or in the bottom 0.5%

19   of individuals her age; (2) Plaintiff's perceptual reasoning score was measured at 63, which is in

20   the extremely low range, or in the bottom 1% of individuals her age; (3) Plaintiff's working

21   memory index was measured at 55, which is in the extreme low range, or in the bottom 0.1% of

22   individuals her age; and, (4) her processing speed was measured at 76, which is in the borderline

23   range of intellectual functioning, or in the bottom 5% of individuals her age. *See id*. at 514-15. The

24   upshot of this intellectual testing was that "[t]he claimant has indications of an intellectual

25   disability." *Id*. at 508. Dr. Catlin also found that Plaintiff "shows adaptive functioning deficits in

26   conceptual, social, and practical domains" as follows:

27

28       She has difficulty with reasoning, problem solving, planning, abstract
         thinking, judgment, academic learning, and learning from experience.

United States District Court
Northern District of California

> She has failed to meet developmental and socio-cultural standard[s] for personal independence and social responsibility. Her adaptive deficits limit her functioning in such areas as communication, social participation, and independent living. In the conceptual domain [Plaintiff] has difficulties in learning academic skills that include reading, writing, arithmetic, time and money management. In the social domain the claimant is immature in social interactions. Her communication and conversation style is concrete and immature for her age. She has difficulty regulating her emotions and behaviors in an age appropriate fashion. She has a limited understanding of risk in social situations, her social judgment is immature for her age and she is at [a] high risk for being manipulated by others. In the practical domain[,] the claimant has deficits in completing daily living tasks. She requires support with grocery shopping, food preparation, transportation, and banking and money management.
> *Id.* at 508.

Dr. Catlin then described the implications and attendant limitations of Plaintiff's intellectual disorder, when combined with the signs and symptoms of her other mental impairments, as such:

> Overall, the claimant will have great difficulty understanding, remembering, and/or applying information given to her. Her mental health symptoms will make interacting with others very difficult. Her anxiety and depressive symptoms primer her to be more irritable, emotionally sensitive, and unable to navigate most social interaction in an appropriate manner. Her paranoia and predisposition to believe others do not like or accept her will cause conflicts in the work setting. Her hyper-vigilance of her surroundings and exaggerated startle response will make concentrating and paying attention to [the] details of a job very difficult. Distraction from mental health symptoms will cause difficulties with keeping up [an] appropriate pace [at] [] work []. Her concentration is impaired and her ability to persist through frustrating or challenging work assignments is significantly diminished. The claimant has severe impairments organizing herself appropriately to be able to arrive on time and show up consistently for employment. The claimant's ability to function independently, appropriately, effectively, and on a sustained basis is very limited. Because the claimant has fewer internal resources to manage stress and mental demands[,] she is vulnerable to decompensation. She has a minimal capacity to adapt to changes in the environment or to demands that are not already part of her life. Executive functions like impulse control, frustration tolerance, [and] appropriate responses to stress are all impaired for this claimant.
> *Id.* at 508-09.

In the end, Dr. Catlin found that Plaintiff experiences marked limitations in very single conceivable category of work-related functioning. *See id.* at 509-10 (opining marked limitations in 23 categories or work-related function ranging from the ability to perform even simple tasks, to the ability to use public transportation). She also found that Plaintiff has had multiple episodes of

decompensation within a 12-month period, and that her condition is expected to last more than 12 months. *Id.* at 510. Dr. Catlin concluded by adding that Plaintiff's "impairments will cause her to be absent from work more than four days per month [and that] [a]t this time[,] the claimant is unable to engage in any meaningful employment and would not be able to obtain or retain a job." *Id.*

### *The Medical Expert Retained by the ALJ*

On November 20, 2019, the ALJ convened a hearing in this case and the first witness to testify was the ALJ's retained medical expert, Faren Akins, Ph.D., J.D. – a psychologist (licensed in California, Arizona, and North Carolina) and an attorney (licensed in California and Arizona). *See id.* at 56-67, 1064-67. Dr. Akins noted that the record indicated that Plaintiff had several severe conditions that "would trigger consideration of listing 12.05 [intellectual disorder] or possibly 12.02 [neurocognitive disorders], 12.04 [depressive or bipolar and related disorders] and 12.15 [trauma and stressor-related disorders]." *Id.* at 57. Pointing out that Plaintiff's FSIQ score shows that her "intellectual capacity is reduced," as well as noting that the record reflects serious deficits in Plaintiff's adaptive functioning skills, Dr. Akins proposed looking at several other listings, and the following exchange took place:

> DR. AKINS: [N]ot sure that we have an indication that that condition dates back to age 22 . . . [a]nd [so] it may be that it makes more sense to use [Listing] 12.02 [neurocognitive disorders] because then we don't have to deal with the issue of whether it predates age 22 or not. So with that in mind I would propose that we look at [Listing] 12.02, 12.04 and 12.15. And from that[,] given that the 'A' prong of each of those is met, I would offer the opinion that to a medical certainty the claimant equals the three listings based upon marked impairments in B1, B3 and B4. And I'll go through those to - - to give you the specifics. Under B1, understand, remember or apply information the IQ scores would certainly support that there are marked difficulties there. The examination that we have [by Dr. Catlin] concludes on pages 8 and 9 that really all four - - Hello? Are we still there?
>
> ALJ: No, we're still here. We're listening.
>
> DR. AKINS: . . . [I]n any event, continuing on the opinion from the evaluation [of Dr. Catlin] on pages 8 and 9 were that all four of the 'B' prong areas were markedly impaired. Certainly I agree with that for #1. I only gave a moderate impairment for interact[ing] with others for B2 simply because I just didn't find a lot here to indicate that somehow there were significant problems in that area. What I did find

United States District Court
Northern District of California

is [that Nurse Landolin's evaluation on] page 3 indicates that the claimant has significant deficits in social cognition. And, let's see under the adaptive deficits noted [by Dr. Catlin], one of those was social functioning. But I also noted that the claimant had a significant relationship and more recently had worked as a live-in healthcare aide for an elderly person, and it seemed like there was some indication that the claimant could function at a greater level than what we would posit for a marked impairment, so I gave a moderate there. For B3, concentrate, persist or maintain pace, I gave a marked impairment there. That was based on [Nurse Landolin's] finding that indicated that the claimant had significant deficits in complex attention. The IQ scores for working memory which would be a basis for concentration and focus and attention [were] quite low at 55. And attention was noted to be severely impaired in [Dr. Catlin's] evaluation []. And then for B4, adapt or manage one's self, I have a marked impairment there. [Dr. Catiln] found that the claimant's insight and judgment were limited . . . [a]nd that [is] even for such things as personal hygiene and basic self-care, self-management if you will, that there were difficulties there . . . And I think those were the couple of items in particular [that] I was relating. The claimant does seem to have poor insight in [Nurse Dominic's] source statement [as well]. And generally it looked like there was overall difficulties with executive functioning [as noted by Dr. Catlin]. And all of that together would certainly suggest to me that the claimant does have marked impairments in the ability to control her behavior, deal with her emotions, adapt to new environments and [the] demands of a workplace . . . [I]n any event, looking at things overall, I think that there are at least two of the 'B' prong areas that would be marked. I – I thought there were three and the evaluation from last year [Dr. Catlin] thought all four [were] marked. And given the [amended onset] date you asked me to consider, October 17th, 2016, I have - - I have no problem with that.

*Id*. at 59-62.

Thus, as set forth above, Dr. Akins opined – "to a medical certainty" – that Plaintiff's conditions meet the requirements of Listings 12.02 (neurocognitive disorders), 12.04 (depression), and 12.15 (trauma and stressor-related disorders).

### *Plaintiff's Hearing Testimony*

As stated above, within hours (if that) of having a seizure event in front of her clinicians at Casa Ubuntu, and within minutes of having another seizure event in front of her attorneys outside the hearing room where the hearing would take place, Plaintiff appeared to testify before the ALJ. *See id*. at 68-75. Through largely leading questioning, the ALJ first managed to establish that Plaintiff had attained neither a G.E.D. nor a high school diploma. *Id*. at 68-69. At which point, the following exchange took place:

ALJ: All right. And you haven't had any seizures in a while, right, because you were taking the medication?

PLAINTIFF: No

ALJ: No, what does that - - no you haven't had any seizures or no you're wrong I have had seizures?

PLAINTIFF: No, I haven't had a seizure.

ALJ: All right, okay, let me see, all right.

ATTORNEY: Your Honor, can I interject for a moment or - -

ALJ: Sure.

ATTORNEY: - - do you want me to wait until you're - -

ALJ: Well, what is it?

ATTORNEY: I just wanted to ask [Plaintiff] if she remembers just having a seizure in the waiting [room]. You don't remember - -

PLAINTIFF: No.

ATTORNEY: - - what just happened?

PLAINTIFF: No.
*Id*. at 70-71.

Thereafter, the ALJ attempted to determine whether Plaintiff has the ability to cook for herself, and if not, why not – however, Plaintiff's responses were largely incoherent such that the ALJ abandoned that line of inquiry. *See id*. at 72. The ALJ's inquiry about why Plaintiff thought she was unable to work was similarly frustrated when Plaintiff was only able to respond to the following effect: "The same. I stop going to my meetings, you know, was kind of hard. So I'm just taking it a day at a time . . . The NA meetings and the, whatchamacallit, the other one, how do you say it?" *Id*. at 73. Then, after a few other routine questions of little import (such as establishing that Plaintiff does not live near any family), the ALJ proceeded to question the VE. *See id*. at 73-75.

### *Vocational Expert Testimony*

During questioning by the ALJ, the VE testified that anyone who would be off-task for 30% of the time would be unemployable. *Id*. at 77. The VE also stated that as far as absenteeism is concerned, that is missing days of work – "employers alloy approximately ten to twelve days a

year . . . about one a month [o]r less." *Id*. The VE later revised his testimony as to the minimum amount of off-task time that might render someone unemployable as such: "[m]y professional opinion is that when you look at what those percentages mean in time[,] that it's approximately 10%. But I think that more than that when you consider that it's off task for 10% or more[,] every day[,] five days a week[,] 40 hours a week, you know, it becomes - - it becomes an issue with maintaining productivity. It's not just one day, it's the consistency over time that's going to add up to be more and more [of] a problem as - - as the time goes on that one is with an employer." *Id*. at 78. Lastly, in an effort of re-plow the same ground one more time, counsel asked the VE whether someone might still be employable if, "[i]n responding to demands, adapting to changes and managing psychologically-based symptoms, where 'moderate' is defined as performance that would be expected to be precluded by 20%." *Id*. at 79. The VE responded, "[n]ot in my professional opinion. I think in the totality you're - - you're presenting a picture of someone that's going to be unable to stay productive in a work environment to the satisfaction of any employer." *Id*.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 16-17. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since her alleged onset date (March 12, 2015). *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had

not engaged in substantial gainful activity during the relevant period. *See* AR at 17. At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 404.1520(c); 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: intellectual disorder, moderate depressive disorder, posttraumatic stress disorder ("PTSD"), anxiety, diabetes mellitus, history of gunshot wounds, seizures, and obesity. *See* AR at 17-18. At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id.* § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. AR at 18-22. Next, the ALJ determined that Plaintiff retained the RFC to perform work at the medium level subject to subject to a number of limitations and exceptions. *Id*. at 22-29.

At Step Four, the ALJ determined that Plaintiff was unable to perform her past relevant work because she has no past relevant work. *Id*. at 29. Lastly, at Step Five, the ALJ concluded, based on the RFC, Plaintiff's age, education, and the VE's testimony, that there are jobs that exist in significant numbers which Plaintiff could perform – namely, the ALJ found that Plaintiff could work as a hand packager or a kitchen helper. *Id*. at 29-30. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act. *Id*. at 29.

## DISCUSSION

The ALJ in this case rejected the opinions of the only examining psychologist (Dr. Catlin) as well as the opinions of the ALJ's own retained medical expert (Dr. Akins), and instead formulated an RFC (the mental components of which) were exclusively based on the ALJ's

United States District Court
Northern District of California

15

1    reliance on a few isolated nuggets of information from the record (that is, the notations of certain

2    intake staff that occasionally noted, for example, that Plaintiff did not appear to be in distress on a

3    particular day). As explained below, these nuggets were taken out of context, and they cannot be

4    construed to constitute substantial evidence that might justify rejecting the well-founded opinions

5    of Drs. Catlin and Akins. Similarly, the ALJ erred by relying on the opinions of two non-

6    examining state agency consultants who opined in 2018 that Plaintiff can perform simple, routine

7    tasks with limited public contact – as those opinions were arbitrary and unsupported, and also

8    because they were contradicted by the overwhelming weight of the record evidence set forth

9    above.

10        Under the regulations that apply to Plaintiff's application, ALJs are required to evaluate the

11   "persuasiveness" of all medical opinions according to factors set forth in 20 C.F.R. § 416.920c.

12   The first two factors, supportability and consistency, are considered the most important, and the

13   ALJ is required to explicitly address them in his or her decision. 20 C.F.R. § 416.920c(b)(2). The

14   ALJ "may, but [is] not required to," explain how he or she considered the remaining three factors

15   listed in the regulations. *Id*. Although the regulations have eliminated the physician hierarchy,

16   deference to specific medical opinions, and assigning certain weight to any given medical opinion,

17   the ALJ must still articulate how he or she considered the medical opinions and how persuasive he

18   or she finds all of the medical opinions. *See V.W. v. Comm'r of Soc. Sec.*, No. 18-cv-07297-JCS,

19   2020 WL 1505716, at *14 (N.D. Cal. Mar. 30, 2020); 20 C.F.R. § 416.920c(a), (b).  As with all

20   other determinations made by the ALJ, the ALJ's persuasiveness explanation must be supported

21   by substantial evidence. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

22   Security as to any fact, if supported by substantial evidence, shall be conclusive").

23        The ALJ rejected Dr. Catlin's opinions "because Dr. Catlin supported the opinion with her

24   one-time examination and the claimant's subjective complaints, both of which were inconsistent

25   with the treatment records." *See* AR at 29. The ALJ then added that "the longitudinal treatment

26   records show minimal abnormalities with many normal psychiatric and mental status

27   examinations." *Id*. Similarly, the ALJ rejected the opinion of her own medical expert, Dr. Akins,

28   because of the notion that Dr. Akins simply parroted the opinions of Dr. Catlin (as well as the

1   opinions of Nurse Dominic and Nurse Landolin) while giving "minimal consideration [] to the

2   extensive treatment records in his testimony." *Id*. at 27.

3          The court finds this reasoning to be incorrect and deficient for numerous reasons. First, Dr.

4   Akins did not simply parrot the statements of others, and he specifically noted that he had

5   reviewed the entire record in this case – something which was evident in his testimony. Second,

6   the overwhelming weight of the treatment records in this case support and bolster Dr. Catlin's

7   findings and conclusions, as well as those of Dr. Akins. Third, Dr. Catlin's opinions *did not*

8   exclusively rest on Plaintiff's subjective complaints – as described in detail above, Dr. Catlin's

9   opinions rested in large part on the administering of a thorough mental status examination and

10  numerous diagnostic instruments such as the WAIS-IV, the RBANS, the BDI, and the Burns

11  PTSD Inventory. Fourth, it should not go without mention that the Ninth Circuit has repeatedly

12  held that, even putting aside the diagnostic instruments and Plaintiff's results on those tests, "a

13  clinical interview and a mental status evaluation . . . are objective measures and cannot be

14  discounted as a 'self-report.'" *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017); *see also*

15  *Savannah v. Astrue*, 252 F. App'x 783, 785 (9th Cir. 2007) ("Diagnosis by a medical expert

16  constitutes objective medical evidence of an impairment."); *Cox v. Apfel*, 160 F.3d 1203, 1207

17  (8th Cir. 1998) ("Depression, diagnosed by a medical professional, is objective medical evidence

18  of pain to the same extent as an X-ray film."). The court should also note that while "[p]sychiatric

19  evaluations may appear subjective, especially compared to evaluation in other medical fields," this

20  does not change the fact that when it comes to many disorders of the mind, "[d]iagnoses will

21  always depend in part on the patient's self-report, as well as on the clinician's observations of the

22  patient. But such is the nature of psychiatry. Thus, the rule allowing an ALJ to reject opinions

23  based on self-reports does not apply in the same manner to opinions regarding mental illness."

24  *Buck*, 869 F.3d at 1049 (citing *Poulin v. Bowen*, 817 F.2d 865, 873, 260 U.S. App. D.C. 142 (D.C.

25  Cir. 1987) ("[U]nlike a broken arm, a mind cannot be x-rayed.")); *see also Ferrando v. Comm'r of*

26  *Soc. Sec. Admin.*, 449 F. App'x 610, 612 (9th Cir. 2011) ("[M]ental health professionals

27  frequently rely on the combination of their observations and the patient's reports of symptoms (as

28  do all doctors) . . . [and] [t]o allow an ALJ to discredit a mental health professional's opinion

United States District Court
Northern District of California

17

1   solely because it is based to a significant degree on a patient's 'subjective allegations' is to allow

2   an end-run around our rules for evaluating medical opinions for the entire category of

3   psychological disorders."); *see also Regennitter v. Comm'r of SSA*, 166 F.3d 1294, 1300 (9th Cir.

4   1999)  (holding that the ALJ erred in discounting the opinion of an examining psychologist on the

5   ground that psychologist "appears to have taken [the plaintiff's] statements at face value" because

6   there was no evidence that the plaintiff was malingering or deceptive).

7        Such was the case here with the ALJ's rejection of Dr. Catlin's opinion – except that it was

8   even more egregious in this case because Dr. Catlin's opinions were even more so based on her

9   administering of a number of widely-used and universally-accepted diagnostic instruments.

10  Accordingly, this is the type of conclusory and baseless reasoning that the Ninth Circuit has

11  repeatedly found to be insufficient. *See e.g. Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir.1988)

12  ("To say that medical opinions are not supported by sufficient objective findings . . . does not

13  achieve the level of specificity our prior cases have required, even when the objective factors are

14  listed seriatim."); *see also Regennitter*, 166 F.3d at 1299.

15       Assuming that the opinions of Drs. Catlin and Akins (as well as those of Nurse Dominic

16  and Nurse Landolin) were "contradicted" by the conclusory opinions of the non-examining state

17  agency consultants who reviewed records at the outset of Plaintiff's disability application process

18  and opined that Plaintiff could perform simple, routine tasks with limited public contact – the

19  court finds that the ALJ failed to express any acceptable explanation for rejecting those opinions.

20  In short, the court finds that the ALJ's reasoning was not based on substantial evidence. Indeed,

21  the court expressly finds that the only body of "substantial evidence" in the record (which has

22  been set forth above) supports the opinions of Drs. Catlin and Akins.

23       Given that the definition of "substantial evidence" is "such relevant evidence as a

24  reasonable mind might accept as adequate to support a conclusion." (*see Biestek*, 139 S. Ct. at

25  1154), the court concludes that the entirety of the ALJ's decision, at least from Step Three

26  forward, is contrary to – and negated by – the totality of the evidence in the record that is before

27  this court. Thus, because the ALJ improperly rejected the opinions of Drs. Catlin and Akins (not to

28  mention the opinions of Nurse Dominic and Nurse Landolin), those opinions will now be credited

United States District Court
Northern District of California

as true as a matter of law. *See Lester*, 81 F.3d at 834 ("[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law."); *see also Benecke*, 379 F.3d at 594 ("Because the ALJ failed to provide legally sufficient reasons for rejecting Benecke's testimony and her treating physicians' opinions, we credit the evidence as true.").

### Nature of Remand

The decision whether to remand for further proceedings or for payment of benefits generally turns on the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292. The Court of Appeals for the Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required).

In light of the above-discussed and improperly discredited medical opinion evidence, it is abundantly clear to the court that Plaintiff has in fact been disabled since her alleged onset date, and it is equally clear that further administrative proceedings would be useless because no further record development is necessary as the ALJ would be required to find Plaintiff disabled on remand based on the evidence and opinions that have been herein credited as true. Viewed through the

lens of Dr. Catlin's opinions, Plaintiff's host of mental impairments clearly *equals* (if not meets) the severity of the criteria for listing-level intellectual disability (Listing 12.05(A) or (B)) given the evidence of significantly sub-average intellectual functioning (*i.e.*, Plaintiff's FSIQ score of 57), as well as the significant evidence of Plaintiff's deficits in adaptive functioning manifested by her dependence on others for even the most basic personal needs, and the evidence indicating an onset prior to the age of 22 (which the court sees in Plaintiff's inability to finish school and her inability to ever attain even rudimentary academic skills – such as reading, writing, and arithmetic). *See* 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 12.05 (wherein either Subpart (A) or Subpart (B) must be satisfied). The court finds that on remand, once Dr. Catlin's findings and opinions are given proper effect, the ALJ would be required to find that Plaintiff's intellectual disorder *at least* equals, if not meets, the requirements under either Subpart A or Subpart B of Listing 12.05. Alternatively, for the reasons expressed "to a medical certainty" by Dr. Akins (as set forth above), which the court does not need to repeat, the court finds that on remand, the ALJ would also be required to find that Plaintiff's conditions meet or equal the requirements of Listings 12.02 [neurocognitive disorders], 12.04 [depressive or bipolar and related disorders] and 12.15 [trauma and stressor-related disorders].

Putting aside the listings at Step Three, there is no disputing the fact that the evidence that has herein been herein credited as true would necessitate a disability finding during the formulation of the RFC as well because it is abundantly clear that Plaintiff retains no residual functioning capacity to perform in the workplace at all for the reasons expressed so clearly in Dr. Catlin's report – reasons which were confirmed and corroborated by the statements of Nurses Dominic and Landolin, as well as by the overwhelming bulk of the medical evidence on record, all of which was further bolstered by the concurring opinion of the ALJ's own medical expert, Dr. Akins.

And, lastly, even if one were to put aside the listings at Step Three, as well as the ALJ's flawed formulation of the RFC, it is still equally clear that on remand the ALJ would be required to find Plaintiff disabled at Step Five based on the testimony of the VE. As mentioned above, the VE testified that missing more than 1 workday per month on a regular basis (*see* AR at 77) or

being consistently off-task as little as 10% of the time (*id*. at 78) would render someone unemployable. Dr. Catlin found that Plaintiff would be absent from work more than four days per month (*see id*. at 510); Nurse Dominic also opined that Plaintiff would be absent more than four days per month and that when she was not absent, she would be off-task more than 30% of the time (*see id*. at 1056-57); and, Nurse Landolin opined that Plaintiff would be absent at least 2 days per month, while being off-task at least 20% of the time when not absent (*see id*. at 1062). Consequently, under any of these opinions – let alone all of them – the ALJ would also be required to find Plaintiff disabled at Step Five based on the testimony of the VE.

At this juncture, it should be noted that in cases where each of the credit-as-true factors is met, it is generally only in "rare instances" where a review of the record as a whole gives rise to a "serious doubt as to whether the claimant is actually disabled." *Revels*, 874 F.3d at 668 n.8 (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," as the record leaves no room to doubt that Plaintiff has in fact been disabled since her alleged onset date, if not much earlier. Needlessly remanding a disability claim for further unnecessary proceedings would only delay much needed income for claimants such as Plaintiff who are unable to work and who are entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). The court finds that the ALJ's unsupported conclusions in this case were thoroughly negated by the overwhelming weight of the record evidence which conclusively and convincingly established Plaintiff's disability such that no further inquiry is necessary.

//

//

//

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 15) is **GRANTED**, and Defendant's Cross-Motion (dkt. 23) is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and award of appropriate benefits consistent with the findings and holdings expressed herein.

**IT IS SO ORDERED.**

Dated: May 10, 2022

ROBERT M. ILLMAN
United States Magistrate Judge